Submitted on briefs September 17, modified September 28, 1915.

## BENO *v.* NORRIS.

(151 Pac. 731.)

**Appeal and Error—Findings in Equity—Harmless Error.**

1. In an equity case, the failure of the trial court to file findings of fact and conclusions of law does not constitute reversible error.

**Quieting Title—Vendor and Purchaser—Rights of Vendor—Nonperformance.**

2. Where a purchaser of land in installments agreed to convey to the vendor a house and lot in satisfaction of one of the installments, but the conveyance was not made, the vendor is entitled to a rescission of the contract, and to its cancellation as a cloud on his title.

**Estoppel—Equitable Estoppel—What Constitutes.**

3. In a suit by a vendor to cancel a vendee's contract, the vendor *held* estopped to assert his rights as against purchasers of part of the parcel contracted to be sold; such purchasers having entered into the agreement in reliance on the vendor's representations.

[As to estoppel *in pais* as question of law or fact, see note in Ann. Cas. 1913A, 1072.]

Estoppel—Equitable Estoppel—Defenses.

4. Where a vendor assured purchasers of part of the parcel from the vendee that they were safe in buying, such purchasers were not estopped, though they did not investigate the county records to ascertain what title their vendor and his grantor had.

From Jackson: ROBERT G. MORROW, Judge.

In Banc.    Statement by MR. JUSTICE BENSON.

This is a suit by Victor E. Beno against T. C. Norris, Nettie B. Norris and B. H. Harris. The facts are as follows:

On February 4, 1908, plaintiff entered into a contract with E. E. Miner and wife for the purchase of a tract of land in Jackson County, containing 206 acres. The contract was in the form of a bond for a deed, and states as the consideration certain payments to be made at stated times, aggregating the sum of $7,500. This instrument was properly acknowledged, and thereafter duly recorded in the office of the county recorder. On March 22, 1910, plaintiff assigned this instrument to defendant B. H. Harris for a consideration of $10,730, of which $2,000 was paid on the same day. The last of these payments was to have been made on September 22, 1910, and was for the sum of $6,000. Some time after the assignment, Harris entered into an arrangement with plaintiff whereby the former agreed to convey to the latter a certain house and lot in Medford, which plaintiff agreed to accept in lieu of such last payment. The title to this property was in the name of the minor children of Harris, of whom he was the guardian, and he represented to Beno that there would be no difficulty in securing an order of the probate court for the transfer. Thereupon plaintiff surrendered possession of the farm to Harris and occupied the Medford residence. Shortly thereafter Harris entered

into negotiations with the defendants Norris concerning the exchange of their Medford residence for 20 acres of the farm. This exchange was finally made on April 9, 1910, Harris receiving a deed to the Norris property, and at the same time giving them a warranty deed to the 20-acre tract, of which they took immediate possession. The latter conveyance contained the following clause: "This deed is subject to a mortgage now held by one E. E. Miner." Harris failed to secure an order from the probate court for the transfer of his children's property to plaintiff, and never made any of the deferred payments, as agreed in the assignment of the bond for a deed, and finally abandoned the venture entirely and left the state, being last heard from at Colon, in Panama. The defendants Norris occupied the 20-acre tract in controversy from April 1910, until September, 1911, when plaintiff served them with notice to quit the premises, which they did. Thereafter, in December, 1913, plaintiff began this suit to quiet title to the entire farm, alleging that he is in possession and the equitable owner thereof, and that defendants claim some adverse interest therein, calling upon them to declare their interest, and praying that his title be quieted as against each of them. The defendant Harris, being served with summons by publication, made default. The defendants Norris answered jointly, wherein, after some denials, they pleaded affirmatively the exchange of their residence property in Medford for a 20-acre portion of the land described in the complaint, and then by way of estoppel allege in substance, among other things, that while negotiations were pending between them and Harris for the exchange mentioned they went to plaintiff and told him of the proposed exchange, and asked him if it would be

all right and proper for them to make the trade; that plaintiff, in reply, told them it was all right; that he had owned the land in question, but had sold it to Harris, and advised them to close the deal; that, relying upon plaintiff's statements, they concluded the transaction as above set out. Plaintiff filed a reply, wherein, after a general denial, he sets up affirmatively the bond for a deed from Miner, the assignment thereof to Harris, the default of Harris as to payments, the retaking of possession by himself, and alleges that, instead of telling defendants that it was all right to deal with Harris, he warned them that neither he nor Harris could give them a conveyance, as the legal title was still in the Miners. A trial was had, and the lower court, without making any findings of fact or conclusions of law, entered a decree quieting title to the 20-acre tract in the defendants Norris, and adjudging that none of the parties should recover costs. Plaintiff appeals.

Submitted on briefs without argument, under the proviso of Supreme Court Rule 18: 56 Or. 622 (117 Pac. xi). MODIFIED.

For appellant there was a brief by *Mr. W. E. Phipps.*

For respondent there was a brief submitted by *Mr. H. A. Canaday.*

MR. JUSTICE BENSON delivered the opinion of the court.

1. Plaintiff's first assignment of error challenges the validity of the decree, because no findings of fact or conclusions of law were filed by the trial court. There is no merit, however, in this contention, for this court has repeatedly held that such omission does not con-

stitute reversible error. In the case of *Sutherlin* v. *Bloomer,* 50 Or. 398 (93 Pac. 135), we read:

"The next point to which our attention has been directed is that the court below made no finding of fact, and it is urged that this duty is made imperative by our Code. B. & C. Comp., Section 406, provides that the court, in rendering its decision in suits in equity, shall set out in writing its findings of fact on all material issues presented by the pleadings, together with its conclusions of law, each of which shall be stated separately from the decree and be filed with the clerk, thereafter constituting a part of the judgment-roll of such cause, and that the findings of fact shall have the same force and effect as a verdict of a jury in actions at law. These provisions are followed by an exception and qualification thereof, to the effect that on appeal the cause shall be tried anew without reference to such findings. Under this exception, it is clear that a failure to make findings should not constitute reversible error; nor can we conceive of any reason why it should have such effect, when all the evidence offered and properly admitted is before the appellate court."

2. We then consider plaintiff's fifth assignment, which is that the court erred in not granting him the relief prayed for as against the defendant Harris. We think that the decree of the trial court should have given plaintiff the relief sought as against Harris.

3. The remaining assignments may well be considered together, since they are all directed to the question of Norris' plea of estoppel. This was their sole defense. The evidence upon this point is in direct conflict. Mrs. Norris testifies thus:

"I went to the place. Mr. Beno was on the place at the time, and I went down there and asked him about it, and he told me that he had sold it to Mr. Harris, this property, the land there, and that he thought it would be all right for us to make the trade, and to trade Mr.

Harris our property in Medford, my property in Medford, for the land. That part of the land that I was to get a deed for, that he had owned that, that he had sold it to Mr. Harris.''

Again, in answer to another question, she says:

''Mr. Beno understood I was to get a deed from Mr. Harris, and he told me it was all right.''

Upon cross-examination she testifies as follows:

''Q. Now, do you tell the court that you went to Mr. Beno and had a talk with him before you made this deal?

''A. Yes, sir; I do.

''Q. And who was present at that time?

''A. Mr. Beno and Mr. Beno's wife. Mrs. Beno, Mr. Norris, and I were present.

''Q. You went there and asked Mr. Beno whether or not you should trade for this?

''A. I went there and told Mr. Beno I was about to trade for this. We talked about it, and Mr. Beno knew I was trading my property in Medford for this 20 acres, and he told me that it was all right, and that the piece of property I was getting was a good piece of property, and that it would be better for us there than in Medford, and gave me encouragement.''

Mr. Norris, in answer to questions, testified thus:

''Well, some time before the trade I went out with Mr. Harris to look the property over, and I come across Mr. Beno—met Mr. Beno up in the field, and talked to him about it, and asked him how about it, what kind of property it was; and he recommended it as being all right. He said he had sold it to Mr. Harris, and it would be a very good trade. He said it would be an excellent trade for us on account of our family, Mr. Beno said; and he said he thought we would do well in making the change and getting our children out on a ranch. And then at another time, that was when I took Mrs. Norris down with me, we went down and saw

Mr. and Mrs. Beno, as Mrs. Norris would not trade on Mr. Harris' word, to find out whether Mr. Harris actually owned the property or not, and there was an abstract in consideration, Mr. Harris told me, and which I supposed there was; so Mrs. Norris says, 'We will go down and see Mr. Beno'; and we did, and Mr. Beno said it would be all right, and for the both of us to make the deal; he thought it was a good deal for Mr. Harris to take the property—that he had sold it to him, that it was Mr. Harris' property then, and Mr. Harris had more money than he knew what to do with, and said several things like that, in order to get us to understand it was all right for us to make the deal.''

In reference to the conversation testified to by Mrs. Norris, the plaintiff testifies as follows:

''Q. State whether or not that is true, as Mrs. Norris testifies, that she came to yourself to make inquiry about this property before the trade for it.

''A. Not that I know of.

''Q. Do you remember of her ever coming there and making any inquiry about it before that time?

''A. No, sir; I don't remember it.

''Q. Well, if she had done so, do you think you would remember it?

''A. I think I would; yes.''

Referring to the other conversation testified to by Mr. Norris, he speaks thus:

''Q. Now, Mr. Norris testifies here that you induced him, or attempted to induce him, to trade the property off for this. Now, is that a fact; did you?

''A. I never did anything of the kind; no, sir.''

Upon cross-examination, plaintiff unqualifiedly denies both conversations, and says that the first knowledge he ever had of the transaction came to him when Norris told him that he had a deed to the 20 acres, and that he then told Norris that his deed was worthless. There was, of course, other evidence bearing indirectly upon

this question; but the only portion which appears to have persuasive force is the following testimony given by the plaintiff on cross-examination:

"Q. When you found out they had moved on to your place there, and as you said had no title to it, why was it you waited for two years before you asked them to move off, until September, 1911, when they moved in there the spring of 1910; why did you wait for two years to ask them to move off, if you knew?

"A. I was living in the Harris house; I was waiting to get a settlement from Harris. I had possession of the Harris house."

We therefore conclude that a preponderance of the evidence sustains defendants' contention that the conversation did take place, and that plaintiff himself was so perfectly satisfied that Harris would make good that, at the time of the exchange between Harris and the Norrises, Beno honestly regarded it as a safe transaction.

4. Plaintiff's contention that Norris was negligent in not going to the county records for his information is not maintainable, for, while Harris at the time had no record title, he had an equitable interest, which was subject to bargain and sale, and defendants had a right to rely upon the statements of Beno.

The trial court did not err in entering a decree in favor of the defendants Norris. A decree will therefore be entered in favor of the defendants T. C. Norris and Nettie B. Norris, quieting title in them to the 20-acre tract, as described in their answer, and giving plaintiff the relief prayed for in his complaint as against the defendant Harris, with a judgment for costs against the latter. Neither of the parties before us to recover costs in this court.        MODIFIED.